Bill LEWIS, Ed. D., and Judy
Lewis, Plaintiffs,

v.

HARRISON SCHOOL DISTRICT NO. 1;
Terry Humble, Superintendent of
Schools, Harrison School District No. 1;
Joe Bill Wilson, M.D., Tom Rogers, Ca-
thy Brandt, Bobby Lowe, Robert Kent,
D.D.S., Richard Hudson, James Har-
ness, and Janet Clark, Individually and
in their Official Capacities as Members
of the Board of Education of the Harri-
son School District No. 1 of Boone
County, Arkansas, and Roy Horne and
Joyce Lindsey, Individually and as
Members of the School Board of the
Harrison School District No. 1, Defend-
ants.

Cir. No. 84–3022.

United States District Court,
W.D. Arkansas,
Harrison Division.

Nov. 1, 1985.

Philip E. Kaplan, and Karen L. Arndt, of Kaplan, Brewer & Miller, P.A., Little Rock, Ark., for plaintiffs.

Felver Rowell, Jr., Morrilton, Ark., G. Ross Smith, P.A., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### I. Introduction

The instant action arises under 42 U.S.C. § 1983, involving conduct on the part of defendant Humble as Superintendent of Harrison School District No. 1, the individual members of the Board of Education of the Harrison School District, and the Harrison School District as a governmental entity. Plaintiffs contended that various actions by the defendants violated the rights secured to them by the First Amendment.

Specifically, plaintiff Bill Lewis alleged that he was wrongfully terminated from his employment as principal of the Harrison High School as a result of a speech he presented to the Harrison School Board during the May 12, 1981, meeting of the board. Dr. Lewis asserted that his speech was protected under the First Amendment and that his termination was retaliatory, thus entitling him to back pay, reinstatement and damages. Plaintiff Judy Lewis alleged that she was threatened with an involuntary transfer of her teaching position from Harrison High School to Harrison Junior High School as a result of her activities with the Harrison Education Association.

Defendants contended during trial that plaintiffs' conduct was not protected by the First Amendment, and that, in any event, Dr. Lewis would have been terminated for reasons unrelated to his speech at the May 12, 1981, school board meeting and further that the proposal to transfer Judy Lewis was unrelated to her HEA activities. The individual defendants additionally assert that they are entitled to qualified immunity based on "good faith."

The case was tried to a jury from September 19 through September 23, 1985. At the close of the evidence, the court submitted ten interrogatories to the jury. The answers to certain of the interrogatories mandated a judgment in favor of defendants with regard to the claim of Judy Lewis. A damages verdict form with respect to the claim of Dr. Lewis was then submitted to the jury. The jury returned a verdict assessing the sum of $25,348.00 as "wages lost" and $5,000.00 as compensation for "violation of First Amendment right to freedom of speech."

Prior to submission of the interrogatories and verdict form to the jury, the court advised the attorneys that it would take under consideration the issue whether the speech or conduct of Dr. Lewis was protected, after considering the pertinent answers to interrogatories and evaluating their legal effect. For reasons set forth below, the court declined to issue a definitive ruling during trial as to whether the speech was protected. In order to avoid a possible re-trial on the issue of damages in the event the court of appeals ultimately disagreed with the court's decision, the issue of damages was submitted to the jury for determination.

At this juncture the court had some doubt as to whether presumed "compensatory" damages for the violation of Dr. Lewis' First Amendment rights could be recovered in this action. The court submitted this element of damage to the jury subject to later decision on this issue, also in an effort to avoid the necessity of a re-trial in the event of disagreement by the court of appeals. The issue of good faith "quali-

fied" immunity was taken under consideration by the court at the close of the evidence. The court will now discuss whether Dr. Lewis' speech was protected, whether the issue of presumed "compensatory" damages was properly submitted to the jury, and the applicability of qualified good faith immunity.

## II. The Protected Nature of the Speech and the "Pickering Balance"

Dr. Lewis' claim invokes the holding in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that "[p]ublic employee(s) do not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983). It is well-settled that consideration of such claims involves a three-step analysis. First, plaintiffs must demonstrate that their conduct was protected; second, plaintiffs must demonstrate that such protected conduct was a substantial or motivating factor in the adverse employment decision; and third, the employer may then show that the employment action would have been taken even in the absence of the protected conduct. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Bowman v. Pulaski County Special School District*, 723 F.2d 640, 643–44 (8th Cir.1983).

Identification of protected activity since *Connick* is a two-step process. *Roberts v. Van Buren Public Schools*, 773 F.2d 949 (8th Cir.1985). As a threshold matter, the speech must have addressed a "matter of public concern," 461 U.S. at 143, 146, 103 S.Ct. at 1688, 1689; *see Collins v. Robinson*, 568 F.Supp. 1464, 1468 (E.D.Ark.1983), *aff'd per curiam*, 734 F.2d 1321 (8th Cir. 1984). If the speech involves a "matter of public concern," the interest of the employee in so speaking must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. The *"Pickering* balance" requires consideration of the following factors:

(1) The need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Bowman*, 723 F.2d at 644.

The inquiry into the protected status of speech is ultimately one of law, not fact. *See Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; *Roberts, supra*, at 954; *Brockell v. Norton*, 732 F.2d 664, 667 (8th Cir. 1984). Proper resolution of this issue, "particularly as to the balancing, may involve determination by the jury of certain underlying facts ...." *Roberts*, at 954. However, the precise nature of the role of the jury in this determination is not well defined, and, in fact, if the Court of Appeals for the Eighth Circuit means what it seems to say in *McGee v. South Pemiscot School Dist. R–V*, 712 F.2d 339, (8th Cir. 1983), the jury's role in cases such as this one may be great indeed.

In *McGee, supra*, the trial judge instructed the jury that its verdict "had to be for the defendants if it believed that McGee's 'exercise of free speech had a disruptive impact upon the employees of Defendant ....'" *McGee* at 342. In that case the court of appeals stated:

As a general rule, a school board may not dismiss an employee for criticizing school policies that are of public interest *unless* the speech contains knowingly or recklessly false statements, undermines the ability of a teacher to function, or interferes with the operation of the school (*citing Pickering* [391 U.S.] at 568–74 [88 S.Ct. at 1734–37]) (emphasis added).

. . . .

It was for the jury to decide whether the letter created disharmony between McGee and his immediate supervisors. *McGee* at 342.

The above-quoted language from *McGee* clearly implies that a school board *may* dismiss an employee for criticizing school policies, even if the policies are of public interest, so long as the speech contains knowingly or recklessly false statements, or undermines the ability of an employee to function, or interferes with the operation of the school. *McGee* also states that the "knowingness," "recklessness" and falsity of any statements are for the jury to determine, as well as whether the speech "undermined" the employee's ability to function, and whether the speech "interfered" with the operation of the school: "The jury obviously found that the letter did not have a disruptive impact, and there is sufficient evidence to support that view." *McGee* at 342.

*McGee*, then, indicates that it is proper to tell a jury to return a verdict for the defendants if the jury finds that the speech had a "disruptive impact" upon the employees of the school. There is very little balancing of interests implicit in this recognition. In other words, under the language in *McGee*, a First Amendment claim may be entirely defeated if the jury finds a "disruptive impact" of the speech by a preponderance of the evidence. The jury was told to determine the "disruptive impact" of the speech, and then was told that "its verdict *had* to be for the defendants" if it found a "disruptive impact." *McGee* at 342 (emphasis added). A review of the trial court's opinion in granting defendants' motion for a judgment n.o.v. in the *McGee* case similarly reflects no "balancing." *See McGee v. South Pemiscot School District R–V*, 545 F.Supp. 171 (E.D.Mo.1982). Although the court of appeals in *McGee* cited *Connick, see McGee*, 712 F.2d at 342 n.4, taken at face value *McGee* essentially allows the *jury* to determine the protected nature of the speech by simply determining the "disruptive impact" of the speech. In fact, since the court in *McGee* said, "It was for the jury to decide whether the letter created disharmony ... ," it can be argued

with force that a failure by the trial court to allow the jury to perform this function is error.

In attempting to harmonize *McGee* with *Connick*, it may be that, because "each case turns on its facts," *McGee* at 342, the trial court in *McGee* had already "balanced" the *Pickering* factors and found that the "disruptive impact" of the speech would be the determinative factor in deciding whether the speech was constitutionally protected. In *Connick* the Supreme Court held that the First Amendment does not require the governmental employer to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships," *Connick*, 461 U.S. at 154, 103 S.Ct. at 1694, where the speech "touched upon matters of public concern in only a most limited sense." *Connick, supra.*

In contrast, however, the *McGee* court found that the speech at issue there involved matters of public concern in a substantial sense, rather than a "limited" sense:

> This case stands on an entirely different footing from *Connick* (citation omitted). In that case ... [t]he Supreme Court reversed the lower court's holding in favor of the plaintiff ... because plaintiff's speech 'touched upon matters of public concern only in a most limited sense' (citation omitted) ... We have before us a case where the plaintiff wrote a letter to a newspaper about an issue that had already been publicly aired by the defendants.

*McGee* at 342 n. 4.

Therefore, even though the trial judge in *McGee* "seems to have thought" that the speech was constitutionally protected, *McGee* at 342 n. 3, and the speech at issue clearly involved matters of public concern in more than a "limited" sense, the *McGee* court approved the use of an instruction which allowed the plaintiff's claim to be defeated upon a jury finding that the speech "had a disruptive impact upon the

employees of Defendant...." *McGee* at 342.

■ It is now generally accepted, contrary to the suggestion in *McGee*, that *Pickering*-type cases do not establish "disruption and disharmony as a *per se* defense to dismissal no matter how egregious the complained of conduct of the superior might have been." *Williams v. Board of Regents*, 629 F.2d 993, 1004 (5th Cir.1980); *Columbus Education Ass'n v. Columbus City School Dist.*, 623 F.2d 1155 (6th Cir. 1980); *Tygrett v. Barry*, 627 F.2d 1279 (D.C.Cir.1980); *Kim v. Coppin State College*, 662 F.2d 1055 (4th Cir.1981). This rule was solidified in *Connick*: "A stronger showing (of disruption and destruction of working relationships) may be necessary if the employee's speech more substantially involved matters of public concern." *Id.*, 461 U.S. at 152, 103 S.Ct. at 1692–93. Therefore, to the extent that *McGee* implicitly approves a *per se* defense of disruption under the guise of the *Pickering* balancing test, *McGee* is confined to its facts and is otherwise an anolmaly as defendants suggest.

Having concluded that none of the *Pickering* factors are entitled to presumptive or dispositive weight, the court must determine which of the factors may properly be submitted to the jury, if any.

It has been held that the causation of disharmony in the workplace is properly a jury question. *Roberts, supra.* If this is the case, there is no reason why the jury should not decide whether the speech in fact impeded the employee's ability to perform his or her duties. Closely tied to these factors are the *need* for harmony in the office or workplace, and the need for a close working relationship, between the plaintiff and others, which the speech may affect. It appears to be proper for the jury to consider the factors of disruption of operations, disharmony among co-workers or breach of a confidential working relationship enumerated by the Court in *Pickering*: "These are matters of fact for which the jury is uniquely equipped to filter out self-serving claims and apply its judgment based on individual experience

and an assessment of the credibility of the disputants." *Kim*, 662 F.2d at 1064; *McGill v. Board of Education*, 602 F.2d 774, 776–77 (7th Cir.1979).

Other of the *Pickering* factors are less appropriate for jury determination, *i.e.*, the time, manner and place of the speech; the context in which the dispute arose; and the degree of public interest in the speech. Without a myriad of specific factual interrogatories it would be difficult, if not impossible, to glean anything of value from the jury with regard to these factors. A jury can state, for example, whether there was *some* public interest in the speech, however, it would be extremely difficult to frame interrogatories which could reveal whether there was a "low" level of public interest as opposed to a "high" level of public interest, *i.e.*, "high" or "low" as compared to what? Similar inquiries regarding the propriety of the time, manner, and place of the speech and the context in which the dispute arose could reveal very little useful information in analyzing the pertinent issues. Therefore, although factual determinations by the jury which bear on these latter factors may be entitled to some degree of consideration, analysis of these factors is more properly left for the court to resolve.

■ Even with regard to those purely factual inquiries which may be properly submitted to the jury, there is some doubt that these jury findings are entitled to dispositive weight: "Because the protected nature of speech is a question of law, however, we may determine this issue in the first instance at the appellate level ...." *Roberts*, at 955. If the court of appeals may determine the issue at the appellate level, as it did in *Roberts*, then it necessarily follows that the Seventh Amendment does not require these factual issues to be submitted to a jury, and that judge or jury findings on these issues are not entitled to the weight ordinarily accorded to factual determinations. This being the case, jury findings on those *Pickering* factors which may be properly submissible to the jury may be disregarded by the court if con-

vinced that such findings are clearly contrary to the preponderance of the evidence. This conclusion is inescapable from the holding in *Roberts*. In *Roberts*, the court of appeals decided that plaintiffs' grievances concerning expenditures of public funds—"whether the district should provide support for the educational trip to the state capitol; whether teachers should have to use their own money to properly do their jobs; and whether adequate money was available for classroom supplies and how such money should be used"—were not protected under the First Amendment, even though clearly matters of public concern: "Because the time and manner of the speech here implicate to a great degree legitimate concerns of the government, as an employer, with insubordination versus respect for proper authority and decision-making procedures, we conclude as a matter of law that (the speech was) not protected under the first amendment." *Roberts*, at 957.

In reaching this conclusion in *Roberts* the court of appeals would necessarily have considered, *inter alia*, the need for harmony and a close working relationship, the degree of disruption caused, and whether the employees' ability to perform their duties was impeded. Yet these are questions the *McGee* court concluded are "for the jury to decide." *McGee* at 342. If *McGee* was meant to suggest that the Seventh Amendment *requires* submission to, and deference to the findings of, a jury on these issues, then the court of appeals could not have resolved the issues at the appellate level in *Roberts*, as these issues had *never* been submitted to a jury. In other words, if *McGee* is meant to state that a party has a right to trial by jury on any of the underlying *Pickering* issues, then the plaintiffs in *Roberts* were unconstitutionally deprived of a jury's views as to their grievances. Because the court of appeals in *Roberts*, by the tone and import of its decision, found no barrier whatsoever to its determination at the appellate level of the underlying facts pertinent to the *Pickering* factors, the court concludes that certain of the *Pickering* factors *may* be submitted to a jury but that jury findings with

regard to the *Pickering* factors are not required nor controlling and may be disregarded if obviously contrary to the preponderance of the evidence. Simply stated, if such jury findings are entitled to the ordinary standard of review, it is only because there is a "right" to a trial by jury on those issues. If there is a "right" to trial by jury on those issues, appellate courts could not decide the disputed factual issues on the appellate level as the court of appeals did in *Roberts*.

As the Supreme Court stated in *Connick*: "[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they (are) made to see whether or not they ... are of a character which the principles of the First Amendment, ... protect." *Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1392 n. 10, *quoting Pennekamp v. Florida*, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946). Because of this obligation, "we cannot 'avoid making an independent constitutional judgment on the facts of the case.'" *Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10, *quoting Jacobellis v. Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1984) (Brennan, J.).

The above language rather strongly implies that it is for the court to determine the underlying constitutional facts in deciding whether speech involves legitimate matters of public concern and in conducting the *Pickering* analysis. Therefore, although *McGee* suggests that certain of the underlying facts are solely within the province of the jury, this court views *Connick* and *Roberts* as a declaration that the court is not "bound" by any such jury findings.

Having decided, somewhat, which of the *Pickering* factors may be submitted to a jury, and, to some extent, the degree of deference to be accorded such findings, the court now turns to an analysis of the principles governing the threshold matter, *i.e.* whether any given speech addresses a "matter of public concern." *Connick*, 461 U.S. at 143, 146, 103 S.Ct. at 1688, 1689; *Roberts*, at 954.

In *Connick* the Supreme Court held that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Further, "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick* at 149, 103 S.Ct. at 1691. Therefore, a court "need not proceed to the *Pickering* balance when the employee spoke not as a citizen but as an employee expressing a personal grievance as to internal office policy." *Roberts*, at 955.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. "Whether expression is of a kind that is of legitimate concern to the public is also the standard in determining whether a common law action for invasion of privacy is present." *Connick* at 143 n. 5, 103 S.Ct. at 1688 n. 5, *citing* Restatement (Second) of Torts § 652D (1977); *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

In *Pickering* the Supreme Court found the plaintiff's speech to involve matters of legitimate public concern because it was characterized as "a difference of opinion betwee Pickering and the Board as to the preferable manner of operating the school system," *Pickering*, 391 U.S. at 571, 88 S.Ct. at 1736, because Pickering's "position as a teacher ... did not qualify him to speak with any greater authority than any other taxpayer," *id.* at 572, 88 S.Ct. at 1736, and because "the fact of employment (was) only tangentially and insubstantially involved in the subject matter of the public communication..." *Id.* The speech at issue in *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), involved a matter of public concern because it involved public disagreement over whether the college should be elevated to four-year status. In *Mt. Healthy City Board of Education v. Doyle, supra,* the plaintiff's speech was held to be protected where he made public, *via* a radio station, an administrative memorandum relating to teacher dress and appearance which the school administration felt was related to public support for bond issues. Plaintiff's publication of the memorandum was held to be "clearly protected by the First Amendment." *Mt. Healthy*, 429 U.S. at 283, 97 S.Ct. at 574. In *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 49 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court held that even private statements concerning racially discriminatory policies of employers involve a matter of inherent public concern.

Reviewing *Pickering* and its progeny, the Supreme Court in *Connick* concluded: "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690.

Prior to the decision in *Connick,* the Court of Appeals for the Eighth Circuit decided *Derrickson v. Board of Education of City of St. Louis,* 703 F.2d 309 (8th Cir.1983). *Derrickson* held that a teacher has a constitutional right to "privately express to his superiors, in a reasonable manner, his criticism of the educational or disciplinary policies ...." *Derrickson* at 316.

In *Connick,* the majority of the speech at issue, a questionnaire circulated to other employees, was held not to involve matters of public concern, because the questions pertaining to the trust and confidence that co-workers possessed in various supervisors, the level of office morale, and the need for a grievance committee were "mere extensions of Myers' dispute over

her transfer." *Connick*, 461 U.S. at 148, 103 S.Ct. at 1690. The court rejected the contention that these questions were of public import in evaluating the performance of the employer as an elected official. According to the court, the plaintiff did not seek to inform the public that the elective office was not discharging its governmental responsibilities, nor did the plaintiff seek to bring to light actual or potential wrongdoing or breach of public trust. Because the focus of the questionnaire was not to evaluate the performance of the office "but rather to gather ammunition for another round of controversy with her superiors," it was not protected. *Id.* As the court noted: "These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a *cause celebre.*" *Id.*

In light of *Connick*, the eleventh circuit in *Renfroe v. Kirkpatrick*, 722 F.2d 714 (11th Cir.1984), held that a teacher's grievance concerning whether she was entitled to a full-time rather than a job-sharing position did not involve a matter of public concern, even though there was a reference to the welfare of the students as a partial motivation of plaintiff's speech.

In *Roberts* the court concluded that plaintiffs' complaints concerning the principal's refusal to tell them the names of complaining parents, his lack of clarity concerning the changes he expected the plaintiffs to make, and the manner in which rules were reviewed before promulgation, "went more to the relationship between (the principal) and the teachers as supervisor and employees rather than to the discharge by (the principal) and the school of their public function of education." *Roberts*, at 956. Other grievances by the plaintiffs concerning expenditures of public funds—district funding for a trip to the state capitol; teacher funding for classroom supplies; the amounts of money that should be used—were held to involve matters of public concern "inconsistent with any characterization of the trip as an 'internal office affair' ...." *Roberts*, at 956.

■ Thus, since *Pickering* the critical inquiry into the "threshold matter" of whether any given speech involves matters of "public concern" has become more focused through individual analysis on a case-by-case basis. The authorities discussed above provide guidelines and principles which this court may utilize in resolving this issue in the present action. As a starting point plaintiff's speech before the May 12, 1985, school board meeting must be carefully scrutinized.

The speech begins:

Because I felt that the agenda of a regular Board meeting might not allow sufficient time to fully discuss the topic at hand, I requested in a memo to the Superintendent, dated April 23, 1981, that a special meeting be convened *to discuss the proposed transfer of Judy Lewis (Dr. Lewis' wife) from the high school to the junior high* (emphasis added).... [P]ersonnel must be ... *allowed to work* (emphasis in original) in those areas in which they are qualified and in those areas in which they have experience and professional desire.... [S]taff members have a right to be consulted—and to make recommendations—about their placement.... [E]very person affected by ... a personnel change should be consulted....

The proposed transfer of Judy Lewis ... seems, to me, to violate common sense, and will be, I believe, a professional error ....

(Plaintiffs' Ex. 1 at 1–2).

[T]his proposed transfer ... involved no consultation on the part of the Superintendent with the junior high principal, the junior high girls' basketball coach, Judy Lewis or myself.

(Plaintiffs' Ex. 1 at 3).

The speech then recites plaintiff's version of an incident which occurred two years previously of which Dr. Lewis was "reminded." This incident involved Judy Lewis' initial recommendation as an assistant girls' basketball coach without any input from the head girls' basketball coach. Dr. Lewis concluded that this was not "fair" to Judy Lewis or to the basketball coach (Plaintiffs' Ex. 1 at 3–4). At this

point Dr. Lewis stated: "Several other things have happened during the past two years which, to me, give me cause to question the judgment of our Superintendent in those particular situations and, particularly, this one." (Plaintiffs' Ex. 1 at 4). He mentioned the other incidents *"in order to clarify why I feel the proposed transfer of Judy Lewis was ill-advised and educationally unhealthy and unsound."* (Plaintiffs' Ex. 1 at 4–5) (emphasis added).

The first such incident of which plaintiff then complained in clarification of his position occurred in October, 1979, when the Superintendent stated to Judy Lewis, "I will club you just like ... anyone else." (Plaintiffs' Ex. 1 at 5) (emphasis in original). This was after he was told that Judy Lewis would serve as chairman of the Professional Rights and Responsibilities Committee of the teachers' association. Dr. Lewis was allegedly cold to "muzzle" her.

Plaintiff's speech then complained about the lack of "warmth" the Superintendent displayed after the October, 1979, meeting (Plaintiffs' Ex. 1 at 6). Plaintiff added: "... I am convinced that the Superintendent has desired to separate us as professional colleagues because our working together quite possibly poses some type of threat to him in his opinion. He knows that I will disagree with him if I feel he is wrong, and he knows, too, that Judy will do likewise. *I might add also that I will support him with all my professionalism—and have—when it is evident that his actions are in keeping with the intent of Board philosophy, goals and written policy,"* in his opinion. (Plaintiffs' Ex. 1 at 6–7) (emphasis in original).

Dr. Lewis next mentioned that in October, 1979, the Superintendent was unhappy because his actions would be audited by the teachers' association (Plaintiffs' Ex. 1 at 8). Plaintiff complained of the Superintendent's "overreaction": "We ... should allow any segment of our District to question anything it wants." (Plaintiffs' Ex. 1 at 8).

Plaintiff went on to note that, in his opinion, the Superintendent was angered over Judy Lewis' teachers' association activities two years prior to plaintiff's speech

(Plaintiffs' Ex. 1 at 9), and because "[W]e have dared to disagree with him and (because) we are prepared to take a stand for what we feel is educationally sound and ethically just in this school district."

Other examples alleged by demonstrating the lack of wisdom possessed by the Superintendent were cited by Dr. Lewis in support of his argument that his wife should not be transferred. The first of these occurred in the preceding spring when the Superintendent announced a proposed staff reduction. According to plaintiff: "[T]he Board of Education graciously stepped in and unraveled a situation that probably would never have happened if sound judgment and foresight would have prevailed earlier." (Plaintiffs' Ex. 1 at 10).

Dr. Lewis then noted his disagreement that spring with the Superintendent's earlier positions with regard to the selection of cheerleaders and Boys State candidates. Plaintiff had changed the selection procedure at the building level without consulting the Superintendent (Plaintiffs' Ex. 1 at 11–12). According to plaintiff, he had in the past "strongly disagreed" with the Superintendent on these issues, whereupon the Superintendent "overreacted" (Plaintiffs' Ex. 1 at 11). However, these issues were essentially "dead" issues and had been resolved at the time of plaintiff's speech, and plaintiff was not attempting to persuade anyone to adopt his positions on these issues, but rather was citing these incidents to demonstrate the Superintendent's overall incompetence in an effort to persuade the board that the proposed transfer of Judy Lewis was a poor decision. At this point, the board members interrupted Dr. Lewis and Dr. Lewis did not finish his prepared text.

Although it is beyond question that "a teacher has a 'constitutional right ... to ... express to his superiors, in a reasonable manner, his criticism of ... educational or disciplinary policies,'" *Derrickson* at 316, and that "[t]he question of what constitutes the proper care and education of children is one of the most frequently debated issues in the public forum," *Bowman*

*v. Pulaski County Special School District,* 723 F.2d 640, 644 (8th Cir.1983), Dr. Lewis' complaints pertained more "to the manner in which the (actions) were reviewed before promulgation" or implementation, *Roberts,* at 956, and "to the relationship between (the superior) and the (employees) as supervisor and employees rather than to the discharge by (the supervisor) and the school of their public function of education." *Id.* As in *Renfroe,* Dr. Lewis' grievance concerned whether his wife was entitled to hold a certain position; not whether the proposed transfer was inimical to the welfare of students. Dr. Lewis' statements were "primarily the expression of personal invective" rather than legitimate input into matters of current public concern. *See Horton v. Taylor,* 767 F.2d 471, 479 (8th Cir.1985).

The avowed purpose of plaintiff's speech was "to discuss the proposed transfer of Judy Lewis from the high school to the junior high," (Plaintiffs' Ex. 1 at 1). The court believes that Dr. Lewis spoke "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," *i.e.,* the proposed transfer of his wife. *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. It is not the function of a school board or superintendent's office to serve "as a roundtable for employee complaints over internal office affairs." *Connick* at 149, 103 S.Ct. at 1691. Dr. Lewis' speech is not properly characterized primarily as "a difference of opinion between (plaintiff) and the (employer) as to the preferable manner of operating the school system," *Pickering,* 391 U.S. at 571, 88 S.Ct. at 1736. Unlike the situation in *Pickering,* in Dr. Lewis' speech the fact of employment was not merely tangentially and insubstantially involved in the subject matter of the speech. As in *Connick,* Dr. Lewis' expression "cannot be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690. Brief references to the trust and confidence that Dr. Lewis and other employees possessed in the Superintendent and to the level of employee morale were "mere extensions of (Dr. Lewis')

dispute over (Judy Lewis') transfer." *Connick* at 148, 103 S.Ct. at 1690. The avowed focus of the speech "was not to evaluate the performance of (the Superintendent)," *id.,* but to protest the proposed transfer of his wife by reciting to the board that the Superintendent had taken other actions in the past months and years with which Dr. Lewis disagreed. His statements "reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a *cause celebre.*" *Id.* A brief reference to an "educationally unhealthy" personnel decision does not convert plaintiff's speech into one involving a matter of public concern. *Renfroe.* Passing allusions to already decided cheerleader or Boys State selection procedures, which *may* have involved matters of limited public concern at one time, cannot transform Dr. Lewis' opposition to a proposed transfer into something more than a personal personnel grievance, any more than a mention of President Kennedy's assassination or quotations from the Gettysburg Address can elevate an employee's displeasure with his placement into a legitimate matter of current public concern. Unlike the speech in *Bowman,* Dr. Lewis' examples of the Superintendent's poor judgment "was not in response to conduct or decisions of the school district or other school personnel at a time when such conduct or decisions were the subject of active public dispute." *Roberts,* at 956. "A government as an employer has a legitimate interest in achieving compliance with decisions that, while once open to dispute and discussion, have been made through proper channels." *Id.; see Kelleher v. Flawn,* 761 F.2d 1079 (5th Cir.1985). Judy Lewis' proposed transfer may or may not have been open to discussion at the time the speech was made, however, Dr. Lewis' complaints regarding a single propos personnel decision and the lack of input therein are simply not ones involving legitimate matters of current public concern. *See Connick; Roberts; Renfroe.* Like the situation in *Connick,* Dr. Lewis "was trying to stir up other people not to accept the changes (transfers) that had been made ... and that were to be implemented." *Con-*

*nick*, 461 U.S. at 151 n. 11, 103 S.Ct. at 1692 n. 11. The court accepts the dissent's well-reasoned conclusion in *Connick* that discussions of office morale and discipline *could* be matters of public concern. *See Connick* at 156–70, 103 S.Ct. at 1694–1702 (Brennan, J., dissenting). Nevertheless, this conclusion "does not answer whether *this* (speech) is such speech." *Connick* at 148–49 n. 8, 103 S.Ct. at 1691 n. 8 (emphasis in original). Accordingly, in light of the foregoing, the court concludes that Dr. Lewis' speech before the May 12, 1981, special session of the school board did not involve current matters of legitimate public concern. Therefore, "it is unnecessary for (the court) to scrutinize the reasons for (his) discharge." *Connick* at 146, 103 S.Ct. at 1689, *citing Clark v. Holmes*, 474 F.2d 928 (7th Cir.1972). The court, thus, need not proceed to the *Pickering* balance. *Roberts*, at 955.

■ However, even if Dr. Lewis' speech could be construed as involving matters of legitimate public concern, which the court does not believe, the court nonetheless concludes that it is not constitutionally protected under *Pickering*.

Although the court had serious doubts as to whether plaintiff's speech could surpass the "threshold" issue as to whether it addressed a matter of public concern at the time the case was submitted to the jury, the court requested that the jury answer certain *Pickering* issues, partly because the language of *McGee* indicates that certain of these issues may properly be submitted to a jury and, arguably, may even be required to be submitted, and partially because *Roberts* indicates that all factual issues properly submissible to the jury should be submitted without being foreclosed by earlier factual or legal conclusions: "It is essential ... that the factual issues be submitted to the jury in separate interrogatories and that the consideration of these interrogatories not be foreclosed by earlier answers so that the court will be able to properly combine the factual findings with its legal conclusions." *Roberts*, at 955. The court also considered the fact that answers to various of the interrogatories could possibly have "mooted" the

court's conclusion as to whether the speech was protected, *i.e.*, if the jury had concluded that the speech was not a substantial or motivating factor in Dr. Lewis' termination, or if they found that it was but that Dr. Lewis would have been terminated regardless, then it would have been irrelevant whether the speech was protected because defendants would then have defeated plaintiffs' claim. *Mt. Healthy, supra*.

The court asked the jury the following interrogatory:

1. Was the relationship between the principal of Harrison High School and the superintendent of schools such as to require a close working relationship between them for a proper operation of the school system?

The jury answered "yes." Not only was the evidence overwhelming on this point, but common sense would dictate that a close working relationship between the principal and superintendent of a school system is essential, absent a peculiar school structure.

The second interrogatory asks the following question:

2. The court asks that you determine whether the speech of Bill Lewis at the special meeting of the Harrison School District held on May 12, 1981, created such disharmony between Bill Lewis and the superintendent that it would have been impossible for Bill Lewis to have properly performed his duties as principal under any circumstances that were likely to exist thereafter.

The jury answered "did not create such disharmony."

The court recognizes that it is not the "test" whether the speech made it "impossible" for Dr. Lewis to properly perform his duties, but rather whether the speech "impeded" Dr. Lewis' ability to perform his duties. *Bowman* at 644. Nonetheless, because there was no evidence that Dr. Lewis' speech did not impede his ability to perform his duties, the court asked the jury its views as to the "impossibility" of such. Quite frankly, the court anticipated that

the jury would answer that the speech *did* make it impossible for Dr. Lewis to perform his duties. Naturally, if the speech made it impossible, then it obviously "impeded" Dr. Lewis' ability to perform his duties.

However, because the court does not feel necessarily "bound" by the jury's answer to this interrogatory (see discussion at pp. 1482–1485, *supra*), and because the evidence was such that fairminded men could not differ as to whether the speech would have "impeded" Dr. Lewis' ability to perform his job duties, *i.e.*, there was not "substantial evidence" to the contrary, it is irrelevant that the jury believed that Dr. Lewis' speech did not make it "impossible" for him to perform his duties. In other words, the court felt that there was insufficient evidence to the contrary to create a "jury question" on this issue, if, indeed, any of the *Pickering* factors are proper jury questions.

The third interrogatory asks:

3. Did the speech of Bill Lewis have a disruptive effect on the operation of the Harrison School System to the extent that it interfered with its proper operation, or would it have had such effect had he not been terminated?

The jury answered that the speech "did not have and would not have had such effect."

For the reasons stated above (see pp. 1482–1485), the court does not believe it is "bound" by the jury's answer. Nonetheless, even if the jury's answer to this interrogatory is to be given the weight properly accorded to "ordinary" jury questions, such as the *Mt. Healthy* issue interrogatories, *i.e.*, "substantial or motivating factor," etc., the court believes that the evidence was so one-sided that the speech would have had a disruptive effect on the school system, at least to a significant degree, that it was, in the court's view, unnecessary to submit the issue to the jury.

The fourth interrogatory asked the jury the following question:

4. Were the matters addressed by Bill Lewis at the board meeting matters

of public concern or matters of public discussion at or before the time of such meeting?

The jury responded, "no."

This interrogatory, of course, cannot necessarily resolve whether the speech involved matters of public concern, as that would appear to be solely a legal question. *See Connick*, 461 U.S. at 143 n. 5; 148 n. 7; 150 n. 10, 103 S.Ct. at 1688 n. 5; 1690 n. 7; 1692 n. 10. However, it does provide some input into the fourth and fifth *Pickering* factors, *i.e.*, "the degree of public interest in the speech" and "the context in which the dispute arose." *See Bowman* at 644. Other than those persons "recruited" to the meeting by Judy Lewis and her friends and co-workers (the court believes with at least Dr. Lewis' knowledge, and probably at his instigation), the evidence was such as to justify the jury's finding that Dr. Lewis' speech did not concern matters of general public discussion. Whether Judy Lewis should or should not have been transferred is not the type of issue that courts have found to be of public concern: "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to supervisor's view that the employee has threatened the authority of the employer to run the office." *Connick* at 153, 103 S.Ct. at 1693. As in *Connick,* "the limited First Amendment interest involved here does not require that (the employer) tolerate action which he reasonably *believed* would disrupt the office, undermine his authority, and destroy close working relationships." *Connick* at 154, 103 S.Ct. at 1694 (emphasis added).

Thus, although the jury correctly found that there was little public concern or discussion of the matters addressed by Dr. Lewis, this finding more accurately pertains to the degree of public *interest* in the subject of the speech, which is a *Pickering*-balance factor, not the "threshold" inquiry into whether the speech involved matters of "public *concern,*" as that term is used in *Pickering* and its progeny. "Public con-

cern" is more a legal term of art rather than a factual finding. Further, it makes little difference how much public interest there is on any given subject if that subject is not a matter of current *legitimate* public concern. For example, it matters not that multitudes of persons in any given small community may be interested in the private goings-on of a young widow, because in such a case, the subject of the public *interest* is not a matter of *legitimate* "public concern." *See* Restatement (Second) of Torts § 652D(b) comments a, b and·h, illustration 6.

As noted, the internal personnel decision of which Dr. Lewis complained was not a matter of legitimate public concern. Nor was there any current legitimate public interest in the incidents to which he referred, *i.e.*, cheerleader and Boys State candidate selection and staff reduction, as those issues were, at the time of the speech, "dead" issues. As noted above, Dr. Lewis' speech, unlike the speech in *Bowman*, "was not in response to conduct or decisions of the school district or other school personnel at a time when such conduct or decisions were the subject of active public dispute," *Roberts*, at 956, insofar as it concerned matters other than the proposed personnel transfer. The court repeats, "[A] government as an employer has a legitimate interest in achieving compliance with decisions that, while once open to dispute and discussion, have been made through proper channels." *Id.*

Considering the *Pickering* factors, the court concludes that there was a relatively high need for harmony in the superintendent's and principal's offices and a close working relationship was required for a proper operation of the school system. The time and place of the speech were selected by the plaintiff solely to provide a forum for his personal personnel complaints and the airing of his personal disagreements with past decisions of the Superintendent that were no longer the subject of active public dispute, if ever they were. As in *Roberts*, because "the time and manner of the speech here implicate to a great degree legitimate concerns of the government, as an employer, with insubor-

dination versus respect for proper authority and decision-making procedures," the court concludes as a matter of law that Dr. Lewis' speech was not protected under the First Amendment.

### Damages

■ Although this holding technically disposes of this action, because appellate courts "are compelled to examine for (themselves) the statements in issue and the circumstances under which they (are) made to see whether or not they ... are of a character which the principles of the First Amendment ... protect," *Pennekamp*, 328 U.S. at 335, 66 S.Ct. at 1031, and therefore cannot "avoid making an independent constitutional judgment on the facts of the case," *Jacobellis*, 378 U.S. at 190, 84 S.Ct. at 1679, the court believes it to be prudent to rule on the other legal issues taken under advisement during the trial of this cause, both to minimize the possible necessity of a retrial, *see Roberts*, at 954–55, and in order to have all of the contested legal issues before the appellate court at the same time in the event this court's decision is appealed.

Plaintiff contended during trial that in the event Dr. Lewis' speech was protected under *Pickering* and the requisite causation issue was determined in his favor by the jury under the *Mt. Healthy* test, Dr. Lewis is therefore entitled to substantial "presumed" compensatory constitutional damages in addition to back pay without proof of actual damage.

It is well-settled that compensatory damages are properly recoverable in an action brought under section 1983 for an alleged violation of a plaintiff's substantive constitutional rights, *Herrera v. Valentine*, 653 F.2d 1220 (8th Cir.1981). The question, however, is when, and under what circumstances, damages may be "presumed" and awarded without proof of actual injury. Dr. Lewis did not present proof of any actual injury, other than lost wages, during trial. No jury question was presented as to any mental anguish, suffering, humiliation, or loss of reputation on the part of Dr. Lewis.

Several cases indicate that "substantial" compensatory damages may be awarded absent any evidence of actual injury. *See Villanueva v. George*, 659 F.2d 851 (8th Cir.1981). Others suggest that only nominal damages may be awarded for a violation of substantive constitutional rights where there is no proof of actual injury. *Solis v. Rio Grande City Indep. School*, 734 F.2d 243 (5th Cir.1984); *Lancaster v. Rodriguez*, 701 F.2d 864 (10th Cir.1983).

The Supreme Court has said, however, that:

> [T]he elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another.

*Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

The Supreme Court also directed us to consider the common law of torts, which has as one of its guiding principles that persons must be fairly compensated for the injuries and losses they suffer as a result of violations of their legal rights. *Id.* at 267, 98 S.Ct. at 1054. When the two purposes of deterrence of future governmental action and compensation for the injured party are achieved "the substantive constitutional guarantee at stake is vindicated and the harmed party is made whole." *Herrera* at 1227.

In *Herrera*, the eighth circuit suggested that "presumed" damages are allowable when substantive constitutional rights have been violated, *id.* at 1228, *citing Dellums v. Powell*, 566 F.2d 167 (D.C.Cir.1977); *Tatum v. Morton*, 562 F.2d 1279 (D.C.Cir. 1977); *Bryant v. McGinnis*, 463 F.Supp. 373 (W.D.N.Y.1978); *Mickens v. Winston*, 462 F.Supp. 910 (E.D.Va.1978); *Manfredonia v. Barry*, 401 F.Supp. 762 (E.D.N.Y. 1975). Nonetheless, *Herrera, Dellums, Tatum* and *Manfredonia* involved unlawful arrests and custodial care and *Bryant* and *Mickens*, respectively, involved religious restraint and racial segregation, all of which present different considerations from those present in retaliatory firing

cases involving the First Amendment. At least one court has plainly stated that, in First Amendment cases, only nominal damages may be recovered absent any real injury. *Basiardanes v. City of Galveston*, 682 F.2d 1203 (5th Cir.1982).

In the *Herrera* line of cases, "the interests protected by the particular constitutional rights at issue (were) analogous to the interests protected by the common law dignitary torts," *Herrera* at 1230 n. 9, *citing* D. Dobbs, *Remedies* § 7.1 at 509 (1973).

These "dignitary" torts "involve some confrontation with the plaintiff in person or some indirect affront to his personality— assault, battery, false imprisonment, malicious prosecution, intentional infliction of mental anguish, libel and slander, invasion of privacy, alienation of affections are all in this category." D. Dobbs, *supra, quoted* in *Herrera* at 1230 n. 9.

A "retaliatory firing" case is unlike cases involving deprivations of Fourth, Fifth and substantive Fourteenth Amendment rights. In those cases the deprivation of the particular interest protected is the element of damage for which compensation is sought. No one would seriously dispute that one is entitled to compensation for excessive force used, *see Putnam v. Gerloff*, 639 F.2d 415 (8th Cir.1981); deprivation of necessary medical care, *Fitzke v. Shappell*, 468 F.2d 1072 (6th Cir.1972); unlawful arrest, *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323 (7th Cir.1978); or denial of custodial right to counsel, *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In cases of that nature, the interests protected by the constitutional right have been denied the victim. The same principle applies to cases involving denial of voting rights, *Wayne v. Venable*, 260 Fed. 64 (8th Cir.1919), and racial segregation, *Mickens*.

In the instant case, however, Dr. Lewis was not precluded from exercising his First Amendment right to speak out on matters of public concern. He was, instead, alleged to have been terminated as a result of his having spoken. He was not deprived of his

ability to express his views, he was deprived of his employment as a result of having expressed his views.

Therefore, the jury, having compensated Dr. Lewis for the damages proven to have been sustained as a result of the deprivation of his employment, plaintiff is "made whole" and the constitutional guarantee at stake is vindicated. This is so because plaintiff is compensated by the award of back pay for his wage loss, and was not precluded from speaking out as he wished at the school board meeting. Once the plaintiff was awarded back pay, there was no other deprivation to be compensated. Had plaintiff been precluded from speaking *via* threats or unreasonable "clearance" procedures, a different situation may have been presented, for in those cases, it is the right to speak that has been denied. Here, plaintiff exercised the opportunity to speak. It was his job which he lost. Having been compensated for the loss of his job, and no other damages having been proved, plaintiff is "made whole." Had Dr. Lewis' speech been "chilled," as Judy Lewis alleged in her claim, and his employment retained as was hers, then "presumed" damages may be appropriate. A retaliatory firing case does not parallel any of the "dignitary torts" listed by Professor Dobbs, nor involve the same sort of interests. Although the court agrees that "*Carey* presents no bar to the recovery of substantial nonpunitive damages for violations of the substantive constitutional rights involved" in *Herrera* and its antecedents, the court does not believe that a substantive/procedural distinction is *per se* appropriate to determine the propriety of presumed damages in any particular case: "... [W]e must consider the nature of the interest that is sought to be protected by the particular constitutional guarantee that is infringed." *Herrera* at 1229, *citing Carey*, 435 U.S. at 265, 98 S.Ct. at 1053.

Although retaliatory firings based upon protected speech and prior restraints on protected speech are equally reprehensible and constitutionally impermissible, the remedies appropriate to each may differ. The court believes that back pay and reinstatement, where appropriate, can in a usual case make a wrongfully terminated plaintiff "whole" where there is no proof of other injuries or damages. However, a prior restraint upon and "chilling" of speech may give rise to general damages that may be recovered in the dignitary tort class of cases which do, not require specific proof of emotional harm to the plaintiff. *Herrera* at 1230, *citing Dobbs, supra,* § 7.3 at 529. In constitutional cases analogous to the dignitary tort cases, "injury is almost certain to result from the wrongful act, and ... the specific injury is difficult to prove. Moreover, since the resulting injury is so likely, no purpose is served by requiring proof of this kind." *Herrera* at 1230, *citing Carey* at 262, 98 S.Ct. at 1051. In cases involving invasions of dignitary rights, "it is predictably difficult to place a value on the resulting injury." *Id.* at 1230.

In the instant case, it cannot be said that injury (other than economic loss) is almost certain to occur and, here, the specific injury caused is not particularly difficult to prove. For purposes of "presumed damages" the court believes that different principles adhere in a "retaliatory firing" case than in Fourth Amendment cases involving unlawful arrests, excessive force, lack of custodial medical care, or invasions of privacy, as well as Fifth Amendment cases involving deprivations of access to counsel, Fourteenth Amendment cases involving equal protection, and Fifteenth Amendment cases involving deprivations of voting rights.

In *Smith v. Board of Education of Morrilton School Dist. No. 32,* 365 F.2d 770 (8th Cir.1966), a plaintiff was allegedly wrongfully terminated on the basis of race. The eighth circuit denied plaintiff Smith *any* damages because he testified that he had subsequently obtained employment at double his former salary: "He thus has made his considered choice and waived any possible claim to relief to which he might otherwise be entitled." In *McGee,* decided two years after *Herrera,* the eighth circuit specifically left *Smith* intact:

Our decision today does not conflict with *Smith* (citation omitted). In that case

the improperly fired teacher found a new teaching position paying double his former salary. He specifically testified that the new job was the "best thing that ever happened to (him) employment-wise." Here, McGee contends that he suffered various losses as a result of having to leave South Pemiscot.

If the plaintiff in *Smith* had been entitled to "presumed" damages in addition to any potential lost salary, it would seem that the court would not have accorded him no relief, and would not have stressed the proof of actual damages in *McGee* in reversing the trial court's entry of a judgment n.o.v. In other words, the *McGee* court distinguished *McGee* from *Smith* by stressing, in *McGee*, the actual proof of various losses, thereby entitling the plaintiff to damages, as opposed to *Smith*, where the plaintiff was held to be entitled to no relief because the plaintiff suffered no damages, though the constitutional violation was clear. Because *McGee* reaffirmed *Smith* two years after *Herrera*, and stressed actual proof of damages, there is some doubt as to what position the eighth circuit would adopt.

In light of the foregoing discussion, the court concludes that "presumed" damages are not recoverable, absent proof of actual damage, in addition to lost wages, in a First Amendment retaliatory-firing case such as is presented here. Accordingly, this element of damage should not have been submitted to the jury and would have been deleted by the court as contrary to law had the court found Dr. Lewis' speech to be protected.

### "Good Faith" Qualified Immunity

█ In the event that the appellate court ultimately disagrees with this court's conclusions that Dr. Lewis' speech did not pertain to a matter of legitimate "public concern," and that, in any event, it is not protected under *Pickering* and its progeny, and instead reinstates the damage award in whole or in part, a ruling by this court at this time on the "good faith" qualified immunity defenses asserted on behalf of the defendants might minimize the necessity for a remand.

Qualified or "good faith" immunity is an affirmative defense that must be pleaded by an individual defendant official. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The Supreme Court has held that qualified immunity would be defeated if an official *"knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the (plaintiff), *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975) (emphasis added). However, in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court said: "The subjective element of the good-faith defense frequently has proved incompatible with our admonition in *Butz* (*v. Economou*, 438 U.S. 478 [98 S.Ct. 2894, 57 L.Ed.2d 895] (1978)) that insubstantial claims should not proceed to trial." *Harlow* at 815–16, 102 S.Ct. at 2737. Judicial inquiries into subjective motivation "can be peculiarly disruptive of effective government." *Harlow* at 817, 102 S.Ct. at 2738. In *Harlow* the Supreme Court therefore held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* at 818, 102 S.Ct. at 2738.

If the law was clearly established, the immunity defense ordinarily should fail, "since a reasonably competent public official should know the law governing his conduct." *Harlow* at 818–19, 102 S.Ct. at 2738. The *Harlow* court

> refashioned the qualified immunity doctrine in such a way as to "permit the resolution of many insubstantial claims on summary judgment" and to avoid "subject(ing) government officials either to the costs of trial or to the burdens of broad reaching discovery" in cases where the legal norms the officials are alleged

to have violated were not clearly established at the time.

*Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

*Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, "conditioned on the resolution of the *essentially legal question* whether the conduct of which the plaintiff complains violated clearly established law." *Mitchell* at ——, 105 S.Ct. at 2816 (emphasis added).

The *Mitchell* court stated: "[T]he *purely legal question* on which Mitchell's claim of immunity turns is 'appropriate for our immediate resolution' notwithstanding that it was not addressed by the Court of Appeals." *Mitchell* at ——, 105 S.Ct. at 2818 (emphasis added) (*quoting Nixon v. Fitzgerald*, 457 U.S. 731 at 743 n. 23, 102 S.Ct. 2690 at 2698 n. 23, 73 L.Ed.2d 349).

Therefore, under *Harlow*, the individual defendants are immune unless their actions violated clearly established law. Whether the defendants' actions violated clearly established law is a legal question for this court to resolve. *See Mitchell*, —— U.S. at ——, 105 S.Ct. at 2817. Accordingly, the court declined to instruct the jury on this issue as requested by the parties. As the Supreme Court clearly indicated in *Mitchell*, the good faith defense should have been resolved, or at least closely scrutinized, by the court on a timely motion for summary judgment. Because a timely motion was not made, the court believed it to be more prudent to take the issue under advisement than to make a hasty decision during trial. In any event, in light of *Mitchell*, the court does not believe that the good faith defense urged should have been submitted to the jury as the parties requested. The question of the individual defendants' immunity turns on whether it was clearly established in mid-1981 that such conduct on the part of the school officials was unconstitutional. *See Mitchell* at ——, 105 S.Ct. at 2817.

In this regard, the court notes that the *Givhan, Perry, Pickering, Mt. Health, Williams v. Board of Regents, Columbus Educ. Ass'n, Tygrett, McGill, Cohn* and *Hill* cases were all decided before the actions of the defendants occurred.

In mid-1981 it was clearly established constitutional law that a public employer may not terminate an employee based upon his expression of protected speech unless the employer can establish that the challenged action would have been taken even in the absence of the protected speech. *See Pickering; Mt. Healthy.* However, the court does not believe that the precise manner of determining whether any given speech is "protected" under the First Amendment was "clearly established" constitutional law in mid-1981, and, in fact, still isn't.

This court has spent many hours in thought and research on the pertinent issues in this case, and has now written in excess of 40 pages on the subject, only to conclude that few, if any, of these issues are "clearly established" by the prior holdings of the United States Supreme Court and the Court of Appeals for the Eighth Circuit. As Justice Powell pointed out in a dissenting opinion in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), a case involving an action of an Arkansas school board, it is probably too much to expect that local officials will know what the law is relative to constitutional rights since the courts are not, by any means, in unanimous agreement in this respect. As Justice Powell said:

The Court's decision appears to rest on an unwarranted assumption as to what lay school officials know or can know about the law and constitutional rights ... One need only look to the decisions of this Court—to our reversals, our recognition of evolving concepts, and our five-to-four splits—to recognize the hazards of even informed prophecy as to what are "unquestioned constitutional rights.

The Supreme Court was split in many if not most of the cases discussed above which purport to set forth the principles applicable to this case. If this court doesn't know what is "clearly established" after hours upon hours of legal research in

the relative comfort of its chambers, and if the learned Justices of the United States Supreme Court can't agree as to the law in this respect, as they clearly can't (see the dissenting opinion of Justices Brennan, Marshall, Blackmun and Stevens in *Connick, supra*), "how in the world" can we expect school administrators and members of school boards, who must run our schools by making "on-the-spot" decisions without the benefit of law clerks and other supporting legal personnel and facilities, to know what is "clearly established" in this respect?

Be that as it may, it was well settled at the time that the dismissal took place that the manner and context in which a statement is made were relevant in the second half of the *Pickering* inquiry—determining whether the employee's speech adversely affects the government's interests as an employer. This was explicitly acknowledged in *Givhan*. Not until *Connick*, however, was it clear that the manner and context in which a statement is made is also relevant to whether the speech pertains to a matter of legitimate public concern. *See Connick*, 461 U.S. at 159, 103 S.Ct. at 1696 (Brennan, J., dissenting). *Connick* also newly suggests that there are two classes of speech of public concern: statements of "public" import because of their content, form and context; and statements that are "inherently of public concern," as the *Connick* court termed the speech in *Givhan*.

The dissent in *Connick* forcefully notes that the majority adopted a different conception of what subjects are of public concern. *See Connick*, 461 U.S. at 163, 103 S.Ct. at 1698 (Brennan, J., dissenting). The dissent in *Connick* also persuasively argues that the majority's conception of which matters are of public interest is inconsistent with the "broad view" of that concept articulated in cases dealing with the constitutional limits on liability for invasion of privacy. *See Time, Inc. v. Hill; Connick* at 165, 103 S.Ct. at 1699 (Brennan, J., dissenting). In any event, the dissent in *Connick* demonstrates that what is and what is not protected speech has varied

from context to context in the last decade and a half.

*Pickering* made clear that a teacher's criticism of the allocation of school funds and a school's method of informing the public about the need for revenue was a matter of legitimate public concern. *Perry* tells us that public disagreement over whether a college should be elevated to four-year status is a disagreement on matters of public concern. *Mt. Healthy* indicates that a teacher dress and appearance memorandum was a matter of public concern. *Givhan* shows that racially discriminatory practices are of public concern.

Suffice it to say that certain indisputable guidelines were well established by mid-1981 as to what constitutes a "matter of legitimate public concern." None of the established guidelines, however, clearly indicated that an employee's personal objections to a proposed personnel transfer and references to "dead" incidents which arguably show poor judgment on the part of the employer in the past, are "legitimate matters of public concern," insulating the employee from termination based on the speech. The well-established rule was to the contrary. The First Amendment's shield does not extend to speech and conduct amounting to insubordination directed at a superior. *See Ahern v. Board of Education*, 456 F.2d 399 (8th Cir.1972) (teacher had no right to ignore school board dictates regarding teaching methods and course content); *Hetrick v. Martin*, 480 F.2d 705 (6th Cir.1973) (university is free to refuse to rehire a nontenured teacher whose methods are incompatible with aims of the university); *Chitwood v. Feaster*, 468 F.2d 359 (4th Cir.1972) (school has right to expect cooperation from teacher in relation to head of the department); *cf. Hillis v. Stephen F. Austin Univ.*, 665 F.2d 547 (5th Cir.1982).

In any event, whether any given speech involves matters of legitimate concern to the public or is otherwise protected is often a "judgment call." In *Connick* the Supreme Court disagreed with the district court and the court of appeals and the

**1498**

dissent disagreed with the majority and agreed with the lower courts. In close cases there obviously remains room for disagreement and the judges who have the duty to "make the calls" don't even know what is "clearly established."

Although, as indicated, the court does not believe that Dr. Lewis' speech was protected under the First Amendment, should the court of appeals disagree with this conclusion, this court nonetheless does not believe that the defendants' conduct in mid-1981 violated then clearly established constitutional law.

The court adds that it was plainly not clearly established in mid-1981 that defendants' alleged retaliatory firing could entitle Dr. Lewis to "presumed damages" rather than nominal damages. This issue is clearly *not* well-settled in the country as a whole. These interrelated issues are developing with a rapid pace and thus far are evolving still. In light of the foregoing, the court concludes that even if Dr. Lewis' speech is protected under current law, which the court doubts, the defendants' conduct in terminating Dr. Lewis' employment did not violate clearly-established constitutional law as it existed in mid-1981. The individual defendants, therefore, are immune from liability in either event.

### Conclusion

First, the court concludes that Dr. Lewis' speech did not involve matters of current legitimate public concern, under *Connick*, and even if it did, is nonetheless not protected under the First Amendment applying the *Pickering*-balancing test.

Second, the court further concludes that in the event the court of appeals disagrees with the court's initial conclusion, the jury's award of "presumed" compensatory constitutional damages must be vacated.

Third, if on appeal it is decided that plaintiff is entitled to any or all of the damages awarded, the court concludes that the individual defendants are entitled to qualified immunity under *Harlow*, and are thus immune from suit in this matter.

A separate judgment in accordance with this opinion will be concurrently entered.