805 F.2d 310
 35 Ed. Law Rep. 1002, 2 Indiv.Empl.Rts.Cas. 500
 Bill LEWIS, Ed.D., Appellant,
Judy Lewis,
v.
HARRISON SCHOOL DISTRICT NO. 1; Terry Humble,
Superintendent of Schools, Harrison School District No. 1;
Joe Bill Wilson, M.D., Tom Rogers, Cathy Brandt, Bobby Lowe,
Robert Kent, D.D.S., Richard Hudson, James Harness, and
Janet Clark, Individually and in their Official Capacities
as Members of the Board of Education of the Harrison School
District No. 1 of Boone County, Arkansas, and Roy Horne and
Joyce Lindsey, Individually and as Members of the School
Board of the Harrison School District No. 1, Appellees.
 No. 85-2359.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 8, 1986.
Decided Nov. 13, 1986.
Rehearing and Rehearing En Banc Denied Jan. 8, 1987.
 
 Philip E. Kaplan, Little Rock, Ark., for appellant.
 G. Ross Smith, Little Rock, Ark., for appellees.
 Before LAY, Chief Judge, and HEANEY and BOWMAN, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 Bill Lewis brought suit under 42 U.S.C. Sec. 1983, claiming that Harrison School District No. 1 and several of its officials fired him as principal of the Harrison High School in violation of his constitutional right to free speech. The jury found in Lewis' favor and awarded him back pay and compensatory damages. The district court[1] set aside this verdict, detailing its reasoning in a published opinion. See Lewis v. Harrison School District No. 1, 621 F.Supp. 1480 (W.D.Ark.1985). The district court found (1) that as a matter of law Lewis' speech was not protected under the first amendment, (2) that constitutional damages could not be presumed, and (3) that the individual defendants were entitled to qualified immunity even if they did illegally fire Lewis. Upon review we sustain the dismissal of the presumed damage award, but vacate the judgment n.o.v. with directions to enter a judgment for the plaintiff on the remainder of the verdict.
 
 I. BACKGROUND
 
 2
 Lewis was hired as principal of Harrison High School in Harrison, Arkansas in July of 1979. On February 20, 1981, Lewis was notified that he would be rehired for the 1981-82 school year. Judy Lewis, the wife of Bill Lewis, was also employed by Harrison High School as an English teacher and head girls' basketball and volleyball coach. Judy Lewis was selected in 1979 to chair the Professional Rights and Responsibilities Committee of the Harrison Education Association, a classroom teachers' organization. After her election, Judy Lewis wrote to the superintendent, Terry Humble, complaining about some lack of activity on the part of the district. On October 15, 1979, she had a meeting with Humble in which her new responsibilities as chairperson were discussed. Two days later, according to Bill Lewis, Humble stated that Lewis should "muzzle" his wife.[2]
 
 
 3
 On April 17, 1981, Humble sent a letter to Judy Lewis stating that she probably would be transferred to the junior high for the following year. Bill Lewis went to Humble's office to protest the possible transfer. He later requested a special school board meeting, so that he could address the board. The meeting was scheduled for and held on May 12, 1981. A public notice of the meeting was published in the local newspaper prior to the meeting. The brief article described the meeting's subject as "the transfer of Judy Lewis." The record indicates that between 50 and 75 persons attended the special meeting. Minutes kept by the board secretary show that nine persons spoke, and all supported Judy Lewis.
 
 
 4
 Next, Lewis began to read a prepared speech. He first asserted that Judy Lewis' transfer would "violate common sense" and would be "a professional error if allowed to take place." According to the minutes, Lewis urged that "the purpose of the school is to offer the best quality education to the students stating this means quality teachers, administrators and support personnel must be employed to work in those areas they are qualified for and have experience [sic]." He added that before a transfer should take place "every person affected should be considered and be free to provide input." In Judy Lewis' case, no other person had been consulted. Lewis then brought up the "lack of professionalism" the superintendent had displayed toward his wife in her new role as head of the teachers' committee. At that point board member Richard Hudson interrupted Lewis and moved that the board go into executive session. Once in executive session, Lewis declined an offer to finish his speech. The board then returned to open session, reprimanded Lewis for his public "attack" on the superintendent and board, and then adjourned the meeting. The minutes indicate that the board heard comments and answered questions after the meeting, and Judy Lewis made a statement.
 
 
 5
 On June 26, 1981, one and a half months after his speech at the May 12 special meeting, Lewis received written notice of a recommendation that his employment contract not be renewed for the 1981-82 school year. The letter to Lewis, signed by board member Tom Rogers, gave four reasons for the recommendation of dismissal:
 
 
 6
 (1) your admitted lack of confidence in the abilities and judgment of the Superintendent who is your immediate supervisor; (2) your recent comment that you will feel free to make an independent determination whether the Superintendent's actions are in keeping with Board policy and to decline to support him if you conclude they are not; (3) your selection of an entirely inappropriate manner (a public board meeting) to express your dissatisfaction and lack of confidence in the Superintendent's job performance and judgment; and (4) my judgment that under these circumstances, it will be virtually impossible for you to develop and maintain the kind of professional rapport necessary to an efficient cooperative and harmonious administrative relationship with the Superintendent.
 
 
 7
 Lewis was eventually told that his position would end on July 10, 1981. He requested a hearing, which was held on August 25, 1981. Immediately after the hearing, the board unanimously voted to terminate Lewis' employment. Lewis filed the present suit on February 24, 1984.[3]
 
 
 8
 At the close of evidence, the trial court submitted ten interrogatories to the jury. In its answers to these interrogatories, the jury found that the positions of superintendent and principal required a "close working relationship between them for a proper operation of the school system," but that Lewis' May 12 speech "did not create such disharmony" between Lewis and Humble "that it would have been impossible for Bill Lewis to have properly performed his duties * * * thereafter." The jury also found that the speech did not have and would not have had a disruptive effect on the school had Lewis not been fired.
 
 
 9
 In response to a fourth interrogatory, the jury found that "the matters addressed by Dr. Lewis at the board meeting" were not "matters of public concern or matters of public discussion at or before the time of [the] meeting." The jury added that Lewis did not know before the meeting that the proposed transfer would not be made. In answer to another interrogatory, the jury found that Bill Lewis' May 12 speech "was a substantial or motivating factor in the school board's decision to terminate his employment." Finally, the jury found that Lewis would not have been fired had he not made the May 12 speech.
 
 
 10
 The jury awarded Lewis $25,348 for lost wages and $5000 for "violation of [his] first amendment right to freedom of speech." The district court set aside these awards upon the defendant's motion for judgment n.o.v. This appeal followed.
 
 II. Discussion
 A. First Amendment Issues
 
 11
 The district court concluded that Lewis' speech "did not involve matters of current legitimate public concern, under Connick [v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ], and even if it did, is nonetheless not protected under the First Amendment applying the Pickering [v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ]-balancing test." See 621 F.Supp. at 1498. As the court's case citations suggest, this is an area in which the United States Supreme Court has in recent years provided a framework for analysis.
 
 
 12
 First amendment decisions in the public-employee-firing context require application of a three-step process.[4] See Roberts v. Van Buren Pub. Schools, 773 F.2d 949, 953 (8th Cir.1985). The first step is to determine whether the speech was "protected" under the Constitution. Under Connick, only speech addressing a "matter of public concern" is protected. See 461 U.S. at 146-47, 103 S.Ct. at 1689-90. Even then, Pickering instructs the court to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." See 391 U.S. at 568, 88 S.Ct. at 1734. To be protected, speech must pass both the Connick and Pickering tests. The second and third steps involve causation. The employee must show that the speech "was a substantial or motivating factor in the adverse employment decision." Roberts, 773 F.2d at 953. Finally, the defendant "may show that the employment action would have been taken even in the absence of the protected conduct." Id. at 953-54.
 
 
 13
 The first question--whether Lewis' speech was "protected"--is one of law. See Connick, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; Roberts, 773 F.2d at 954. Although our decision in McGee v. South Pemiscot School Dist. R-V, 712 F.2d 339 (8th Cir.1983), does require the court to follow the jury's findings on certain underlying facts, such as whether the speech created disharmony, see id. at 342, we find no precedent for use of a jury finding on the issue of public concern. The jury found that Lewis' speech did not involve matters of public concern on or before May 12. Even if McGee is read to require deference to jury findings on the Connick issue, we would reject this particular finding as wholly unsupported by the record.
 
 
 14
 Lewis' speech clearly involved issues important to the public. The large turnout at the special board meeting is just one testament to that conclusion. The local newspaper, pursuant to Arkansas law, published a news item regarding the scheduled meeting. Some thirty teachers signed a petition stating that the Lewises in combination did not disrupt the high school. Some 50 persons signed a request for the special meeting. Possibly most telling is the substance of the controversy itself. The superintendent of schools was proposing to transfer a teacher and varsity coach. Because the teachers and coaches in a public school district can deeply impact children's lives, school personnel assignments obviously are of considerable concern to those children, their parents, and others in the community. Lewis' statement reflects another equally important subject involving public concern. Lewis voiced his solicitude over Judy Lewis' treatment by Superintendent Humble after Judy Lewis had been appointed to lead the teachers' professional rights and responsibilities committee. Lewis complained that the superintendent told Judy Lewis to "make no mistake I will club you the same as anybody else."[5]
 
 
 15
 This case has great factual similarity to our recent decision in Cox v. Dardanelle Pub. School Dist., 790 F.2d 668 (8th Cir.1986). Nancy Cox, the plaintiff in that case, was an eighth grade teacher who became active in the local teachers' organization and was subsequently discharged for alleged insubordination arising from criticism of school administrators. Cox succeeded in proving that the school board had wrongfully retaliated against her for her organizational activities and speech. The court found as well that Cox's relationship with the principal was not " 'of such a personal and intimate nature that certain forms of criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them.' " See id. at 674 (quoting Pickering, 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3.).
 
 
 16
 Even more relevant to the present case, however, is the Cox court's determination that Nancy Cox's speech and activities involved issues of public concern. The court, speaking through Judge John R. Gibson, observed:
 
 
 17
 [W]e believe that much of Cox's speech directed at the school's personnel policies was not motivated solely by employment concerns, but was legitimate criticism of policies and administration which affected the educational function of the school. Cox was critical in her individual grievance, and by proxy, in the general grievance, of the manner in which [Principal] Dillard dealt with the faculty, and expressed the view that Dillard's administrative style had discouraged teacher input, inhibited teachers' use of different teaching techniques and classroom methods, significantly affected teacher morale at the school, and affected the students. Cox's statements on these matters were not the comments of a single employee bearing on issues unique to that employee. Nor were her comments concerned solely with the immediate supervisor-employee relationship between Dillard and the faculty. They obviously touch in great measure upon the ability of Dillard and the faculty to "discharge ... the public function of education." Cox's comments are clearly attempts to inform Dillard, and ultimately his superiors, that his actions were interfering with the efficient and proper discharge of the crucial responsibilities of the faculty.
 
 
 18
 Id. at 673 (citations and footnotes omitted). We find Judge Gibson's comments controlling in our assessment of whether Lewis' speech was within the protected area of public concern.[6] See also Bowman v. Pulaski County Special School Dist., 723 F.2d 640, 644 (8th Cir.1983) ("The question of what constitutes the proper care and education of children is one of the most frequently debated issues in the public forum. * * * In this case the media coverage and activities of the parents are a good indication of the public's interest in these events.").
 
 
 19
 This is not a situation like the private personnel dispute involved in Connick. See 461 U.S. at 148, 103 S.Ct. at 1690. Connick involved intraoffice turmoil of little import to those outside the office. We hold that Lewis met the first burden, under Connick, of showing that his speech touched on issues of public concern.
 
 
 20
 We next must perform the so-called "Pickering balance." This requires consideration of the following factors:
 
 
 21
 (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.
 
 
 22
 Bowman, 723 F.2d at 644; see Pickering, 391 U.S. at 569-73, 88 S.Ct. at 1735-37; Connick, 461 U.S. at 149-54, 103 S.Ct. at 1691-93; Roberts, 773 F.2d at 954, 956-57. The court below submitted interrogatories to the jury relating to most of these factors. The responses found the need for a close working relationship between Lewis and his superintendent, but that Lewis' speech did not or would not cause enough disharmony in that relationship to make Lewis' job impossible to perform.
 
 
 23
 Despite our decisions in McGee and Roberts, the trial court disregarded the jury's findings in balancing the factors under Pickering. This was error. While the ultimate decision is one of law, the court must defer to factual findings unless they are totally unsupported by the record.
 
 
 24
 Pickering requires that the interests of the employer be balanced against those of the speaker. The Harrison School District indeed has important interests in operating its schools in an efficient and educationally productive manner. The board and superintendent properly strive to avoid disruption in the classrooms and distraction of teachers and staff. Cf. Tinker v. Des Moines Indep. Pub. School Dist., 393 U.S. 503, 509, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969) (upholding student speech that would not " 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school' ") (quoting Burnside v. Byars, 363 F.2d 744, 749 (5th Cir.1966)). The question is whether these interests justify suppression of Lewis' speech or dismissal of Lewis as principal. We hold that they do not. Cf. Cox, 790 F.2d at 672-75 (discussed above).
 
 
 25
 The jury found that Lewis' speech would not create such disharmony in his working relationship with Superintendent Humble that Lewis would not be able to do his job as principal. This conclusion is reasonable, given that both were professional administrators, accustomed to the disagreements inherent in operating a school. Lewis' speech was civil in tone, and was largely phrased in a manner calculated to influence rather than injure. There is no evidence that after the transfer proposal was shelved, Principal Lewis could not have continued operating the high school in an efficient and educational manner. In short, the governmental interest involved would not have been significantly harmed by allowing Lewis to continue as principal after making his speech.
 
 
 26
 The time, place, and manner of Lewis' speech also weigh in his favor. The speech came at a special school board meeting. Other concerned parents had offered their views on the transfer of Judy Lewis. Lewis had already exhausted the other available avenues in his attempt to stop the transfer. The special board meeting was an appropriate time and place for his continued efforts. The "manner" of Lewis' speech, as noted earlier, was basically appropriate as well. Although Lewis, in retrospect, could have narrowed the scope of his speech to the transfer itself, the overall tone of his prepared speech was not unduly inflammatory or threatening. Lewis implied that his wife's transfer was direct retaliation from the superintendent by reason of Judy Lewis' appointment to chair the teacher's committee. The public and all teachers had a right to be informed over these events. Speech is not unprotected under the Constitution just because it is critical, even when its criticism is bluntly worded and directed at specific governmental officials. See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964) (noting "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"); Garrison v. Louisiana, 379 U.S. 64, 67-79, 85 S.Ct. 209, 212-18, 13 L.Ed.2d 125 (1964) (protecting criticism of judges); Wood v. Georgia, 370 U.S. 375, 379, 391-93, 82 S.Ct. 1364, 1373-74, 8 L.Ed.2d 569 (1962) (protecting sheriff's letter to grand jury; letter critical of judge).
 
 
 27
 We need not repeat our earlier discussion on the "degree of public interest in the speech," see Bowman, 723 F.2d at 644, or the "context in which the dispute arose," see id. The record shows that Lewis spoke in the context of a controversial proposed action at a public school, and that this action concerned many people in the community. In completing the Pickering balance, these factors weigh heavily in favor of Lewis' interest in making his speech.
 
 
 28
 We conclude that Lewis' speech was protected by the first amendment. It involved a matter of public concern as required by Connick, and it passes the balancing test of Pickering.
 
 
 29
 Next, we must inquire into causation. Lewis must show that his speech was a substantial or motivating factor in his firing. Without this showing, the protected nature of his speech will not alone support a decision for the plaintiff under 42 U.S.C. Sec. 1983.
 
 
 30
 The school officials gave several reasons for Lewis' dismissal. In his letter to Lewis, board member Tom Rogers listed as a reason for his recommendation of Lewis' dismissal "selection of an entirely inappropriate manner (a public board meeting) to express your dissatisfaction and lack of confidence in the Superintendent's job performance and judgment." After hearing this and all of the other evidence, the jury reached two important conclusions. First, the jury found that Lewis' May 12 speech was a substantial or motivating factor in his firing, and second, the jury specifically concluded that Lewis would not have been fired but for the speech.
 
 
 31
 Substantial evidence supports the jury's findings on the reasons for Lewis' dismissal. Just four months before he ultimately was fired, Lewis' contract for the 1981-82 school year was extended. The intervening cause of the dismissal was Lewis' disagreement with both the proposed transfer of Judy Lewis and the superintendent's overall treatment of the Lewises since Judy Lewis was elected to chair the teacher's committee. These two events were the primary subjects of Bill Lewis' speech. The school board publicly reprimanded Lewis immediately after his speech. One week later the board voted to delay its offer of Lewis' new contract. Another month later Rogers notified Lewis that Rogers was recommending that Lewis be fired. After a hearing, Lewis was terminated. This series of events points directly to Lewis' speech as the reason for his dismissal.
 
 
 32
 Perhaps the most damaging evidence against the school district on the causation issue, however, is Rogers' written justification for the dismissal. The speech was one of four bases specifically listed, and the other three all were tied to the substance of the speech. In combination with the strong evidence discussed above, Rogers' letter leaves little doubt why Lewis was fired. We hold that Lewis has met his burden of showing that his speech was a substantial or motivating factor in the board's decision to fire him.
 
 
 33
 The final step in our analysis also relates to causation. The board may avoid liability if it shows that it would have fired Bill Lewis even had he not made the May 12 speech. See Mt. Healthy City School Dist. Board of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Our preceding analysis is conclusive on this point. As the jury found, Lewis' speech cost him his job for 1981-82. The other reasons offered for his dismissal all were known to Humble and the board when they voted to renew Lewis' contract in February of 1981. The May 12 speech stands out as the sole reason for their change in plans, and substantial evidence exists in the record to sustain the jury's finding in this regard.
 
 
 34
 Our analysis of the first amendment issues and evidence in the record shows that Bill Lewis was discharged in violation of his right to free expression under the Constitution. For these reasons, we reverse the district court's decision as to the defendants' liability under 42 U.S.C. Sec. 1983.
 
 B. Presumed Constitutional Damages
 
 35
 The jury awarded Lewis $5000 for violation of his first amendment right to freedom of speech. Because no specific evidence was introduced to support this award of constitutional damages, it falls into the category of "presumed" damages. The district court vacated this award, holding that presumed damages are not available in a Sec. 1983 action based on a first amendment violation.
 
 
 36
 A recent decision of the United States Supreme Court casts considerable doubt on the availability of presumed damages in the present case. In Memphis Community School Dist. v. Stachura, --- U.S. ----, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), which was decided while appeal of this case was pending, the Court held that there is "no room for noncompensatory damages measured by the jury's perception of the abstract 'importance' of a constitutional right." The Memphis case involved a school teacher suing under Sec. 1983 after a suspension that the jury found violated his right to freedom of speech.
 
 
 37
 Although the concurring opinion in Memphis attempted to narrow the majority's holding, see id. at 2546 (Marshall, J., concurring), we read the Court's decision as foreclosing Lewis' claim for presumed damages. The majority held that "[p]resumed damages are a substitute for ordinary compensatory damages, not a supplement for an award that fully compensates an alleged injury." See id. at 2545 (emphasis in original). This language controls our decision. Any door left open by Memphis is not for plaintiffs like Lewis, whose damages are readily measurable.[7]
 
 
 38
 We conclude that the district court, without the aid of the then-undecided Memphis case, correctly overturned the jury's separate $5000 award of presumed constitutional damages.
 
 C. Qualified Immunity
 
 39
 The district court found that the individual board members and school officials could not be held liable under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), because they could not be held to reasonably be aware that Lewis' speech was protected under the first amendment. The court reasoned that Connick had not yet been decided when Lewis was fired and that the court itself had great difficulty in determining whether the speech was of public concern. The court thus concluded it was not unreasonable for laypeople to fail to recognize protected speech.
 
 
 40
 Although it is true that ordinary citizens may not keep abreast of all court decisions, we do not think the district court's analysis is helpful. Under Harlow and Mitchell the test for invoking qualified immunity is whether a defendant governmental official's conduct violated "clearly established constitutional or statutory rights of which a reasonable person would have known" at the time of the alleged violation. See Harlow, 457 U.S. at 818, 102 S.Ct. at 2738; Mitchell, 105 S.Ct. at 2814, 2818.
 
 
 41
 Although Pickering, a 1968 decision, is the predominant Supreme Court opinion in this area, other long-standing cases clearly establishing school employees' rights to free speech include Mt. Healthy, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). The right to free speech is fundamental to our entire democratic system of government. Humble, Rogers, and the other school officials needed no legal training to know that they could not fire Bill Lewis because he exercised that right. There was little doubt that Bill Lewis was speaking at a public meeting, and that the subject matter of his statement focused on the transfer of a teacher within the school district and on Lewis' concern over lack of professionalism displayed by the defendants since Judy Lewis' election as chairperson of the teachers' committee. Bill Lewis' speech clearly was protected in 1981, and it remains so today. We find the district court erred as a matter of law in granting qualified immunity to the individual defendants as individuals.[8]
 
 
 42
 The cause is reversed and remanded to enter judgment on the verdict in accordance with this opinion.
 
 
 
 [1]
 The Honorable H. Franklin Waters, Chief Judge of the United States District Court for the Western District of Arkansas, presiding
 
 
 [2]
 Humble denied this conversation at trial
 
 
 [3]
 Judy Lewis also was a plaintiff below. She claimed that the proposed transfer violated her rights under the first and fourteenth amendments. The jury rejected this claim, and judgment was entered against Judy Lewis. She did not appeal
 
 
 [4]
 In Cox v. Dardanelle Pub. School Dist., 790 F.2d 668 (8th Cir.1986), a panel of this court referred to a two-step process. See id. at 672. The panel noted that Connick provides a "public concern" test and that Pickering provides a "balancing test." We have no disagreement here; we simply speak of a combined "protected speech" inquiry and two further steps relating to causation
 
 
 [5]
 See Minutes of Board of Education, Harrison School Dist. No. 1, at 3 (May 12, 1981). The board's report continued:
 Dr. Lewis said he told the superintendent that [Judy Lewis] was free to join and participate in any organization of her choice and that he (Dr. Lewis) would not muzzle her as had been suggested to him by the superintendent or allow the superintendent to intimidate or threaten them in any way. * * * He said a copy of Judy's letter was attached to a memo to district personnel and that it appeared to him to be a communication devised in an attempt to discredit the committee in the eyes of the staff. He said the superintendent showed him a copy and suggested that I needed to counsel Judy. Dr. Lewis said he felt the superintendent over reacted [sic] to the letter and was angered. Dr. Lewis said he felt he would best serve the district to work harmoniously with the teacher association without overacting [sic] to everything it did. He indicated that the superintendent's attitude with Mrs. Lewis has not been the same since this incident. He further said they feel that his attempt to transfer her was colored by the fact that they have disagreed with him and that they are prepared to make a stand for what they feel is educationally just and sound.
 Id.
 
 
 [6]
 The district court's opinion was written on November 1, 1985, so the court did not have the benefit of our decision in Cox, which was published on April 30, 1986
 
 
 [7]
 As the majority opinion acknowledged, the holding in Memphis does not preclude all presumed damages awards. "When a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may possibly be appropriate." Memphis, 106 S.Ct. at 2545 (emphasis added); see also id. at 2548 (Marshall, J., concurring) ("I do not understand the Court * * * to hold that deprivations of constitutional rights can never themselves constitute compensable injuries.")
 
 
 [8]
 The verdict against the defendant officials in their official capacity, on the other hand, is simply a finding that the school district is liable. See Brandon v. Holt, 469 U.S. 464, 471-73, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). The doctrine of qualified immunity is not a defense to the school district's liability. See id.; Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980)