**Marcie McINTIRE, Appellant,**

v.

**The STATE of Minnesota, Minnesota Housing Finance Agency, James Solem, Individually and in his Official Capacities as its Executive Director; Henry Wesley, Individually and in his Official Capacities as its Personnel Director; and Michael Haley, Individually and in his Official Capacities as Director of Home Mortgage Program, Respondents.**

No. C6–89–2265.

Court of Appeals of Minnesota.

Aug. 7, 1990.

Review Denied Sept. 28, 1990.

Stephen C. Fiebiger, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Sara H. Jones, Sp. Asst. Atty. Gen., St. Paul, for respondents.

Considered and decided by LANSING, P.J., and SCHUMACHER and SHORT, JJ.

## OPINION

LANSING, Judge.

Marcie McIntire seeks damages under 42 U.S.C. § 1983 for alleged violations of her civil rights and liberties and for various state law claims arising from discharge from her employment with the Minnesota Housing Finance Agency. Three of the defendants, all government officials, unsuccessfully moved for summary judgment claiming a qualified immunity from liability on the free speech allegations. On appeal from the denial of their motion we reversed and remanded, directing the trial court to reconsider its decision in light of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See McIntire v. State,* 419 N.W.2d 799 (Minn.App.1988), *pet. for rev. denied,* (Minn. Apr. 20, 1988) ("*McIntire I*").

On remand, the trial court in two successive rulings granted summary judgment against McIntire on all claims. McIntire now appeals the adverse judgment on the alleged violations of free speech, liberty, and due process and on her claims of dis-

crimination, defamation, breach of contract and wrongful discharge.

## FACTS

Marcie McIntire was employed from July 1984 to February, 1985, as the Indian Housing Coordinator for the home mortgage division of the Minnesota Housing Finance Agency. Her duties included overseeing the administration of funds to several Indian housing programs and working with the administrators of those programs and the Indian communities which they serve. McIntire's supervisor, Michael Haley, had ultimate responsibility for approving program budgets.

Prior to McIntire's hiring, the agency had begun an investigation of one of the programs, the St. Paul Intertribal Housing Board. When McIntire was hired she was informed of the reports that the board had misused agency funds by making unauthorized loans and salary increases and that measures were underway to correct any misappropriations.

Two months into the position McIntire made several public statements which her supervisors viewed as inappropriate. At a tribal meeting she indicated that the state auditor had a conflict of interest in auditing one of the Indian programs. At a public meeting with the Urban Indian Advisory Council, McIntire implied that board members were sophisticated embezzlers. McIntire also contradicted her supervisor at a Housing Finance Agency board meeting.

Six months after McIntire was hired, Haley intercepted an outgoing envelope addressed to "Senate Council" and discovered a nine-page memorandum addressed to him from McIntire. Although the memorandum was dated three days earlier, Haley had not seen it. The memo outlined in detail how expenditures by the board had exceeded their approved budget and stated that McIntire opposed continued funding to the board.

Haley directed McIntire not to distribute the memo. Despite Haley's order and without informing him of her action, McIn-

tire mailed copies of the memo to six individuals outside the agency, including a union representative and members of the Indian community.

Because of McIntire's public statements, but without knowledge of her distributing the memo, the agency withheld certification of McIntire's permanent employment and extended her probationary period. The agency notified McIntire by written memorandum how her conduct should be corrected in order to gain permanent employment.

Haley received calls from members of the Indian community who told him that McIntire's memo had been "widely distributed." The agency concluded that McIntire's actions were insubordinate and that the working relationship had completely broken down and terminated McIntire's employment.

After exhausting grievance procedures under her collective bargaining agreement, McIntire brought this action against the State of Minnesota, the Housing Finance Agency, agency executive director James Solem, agency personnel director Henry Wesley and Haley.[1]

## ISSUES

1. Does the qualified immunity doctrine apply to the conduct of individual government officials?

2. Was McIntire deprived of property or liberty without due process of law in violation of the fourteenth amendment?

3. Is there any evidence to support the claims of discrimination?

4. Are there material issues of fact on the remaining state law claims of defamation, breach of contract and discharge in violation of public policy?

## ANALYSIS

### I.

*First Amendment Claims*

■ The federal standard of qualified immunity applies in actions under 42 U.S.C. § 1983 brought in Minnesota courts.

---

1. These facts are largely taken from *McIntire I,* 419 N.W.2d at 800–801.

*Finch v. Wemlinger,* 310 N.W.2d 66, 70 (Minn.1981). Under this doctrine, government officials are not liable for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. McIntire contends that Solem, Wesley and Haley violated her clearly established first amendment rights when McIntire was discharged in 1985.[2] This is a question of law, although it obviously turns on factual predicates. *McIntire I,* 419 N.W.2d at 802.

More than twenty years ago, the Supreme Court ruled that public employees do not abandon their constitutionally protected freedom of speech when they enter the work place. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Countering this right, the Court recognized that public employers would lose their ability to function effectively if they could not control employee expression to some degree. To mediate these competing rights *Pickering* requires the use of a balancing test. *Id.*

The threshold question on the employee's side of the balance is whether the employee's statements may be "fairly characterized as constituting speech on a matter of public concern." *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987) (citing *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983)). This analysis includes an examination of the content, form and context of the statements. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690.

■ McIntire's memorandum addressed the unauthorized, possibly fraudulent, expenditures of public funds and discrepancies in financial records. Irrespective of the accuracy of the statements, the subject matter, breach of public trust, is a matter

of public interest. *See Roth v. Veteran's Administration,* 856 F.2d 1401, 1406 (9th Cir.1988); *Czurlanis v. Albanese,* 721 F.2d 98, 104 (3d Cir.1983). That a legislative audit raising similar concerns was issued just prior to the distribution of McIntire's memo substantiates the public interest.

We do not overlook that McIntire had a personal stake in drafting the memo and that this motivation detracts from the first amendment implications. *See Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. McIntire had confided to a union official her fears of being held liable for the funding abuses. The official advised her to write a memorandum detailing her disagreements with the agency's position. Although motivation behind a statement may affect the ultimate balance, subject matter is the predominant factor in this threshold analysis. *Yoggerst v. Hedges,* 739 F.2d 293, 296 (7th Cir.1984). McIntire's statements charged serious improprieties which were a matter of public concern.

Having determined that the employee's speech is of public concern, we turn to the employer's side of the fulcrum. In determining the state's interest, we must consider:

(1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Lewis v. Harrison School District No. 1,* 805 F.2d 310, 315 (8th Cir.1986); *cert. denied,* 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987).

**2.** In her appeal brief, McIntire did not raise or argue her free speech and due process claims against the State of Minnesota and the Housing Finance Agency. Although these claims appear unfounded (*see Will v. Michigan Dept. of State Police,* —— U.S. ——, ——, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989), holding eleventh amend-

ment bars § 1983 action against a state and its departments), they have been waived and cannot be revived by addressing them in the reply brief. *See Balder v. Haley,* 399 N.W.2d 77, 80 (Minn.1987), Minn.R.Civ.App.P. 128.02, subd. 3 (1990).

We note initially that McIntire's position in the agency was one of high profile. She was an agency spokesperson. Employees with this type of responsibility carry a corresponding duty of caution with respect to the words that they speak. *Rankin,* 107 S.Ct. at 2900. McIntire's public confrontation with the agency could only undermine her ability to perform the duties of her job, especially when one considers the harsh tone of her memorandum. *See Patkus v. Sangamon–Cass Consortium,* 769 F.2d 1251, 1258 (7th Cir.1985) (county liaison's ability to represent her employer was hindered by inappropriate statements.)

We also consider that the issues raised in McIntire's memo had already been the subject of a legislative auditor's report. The alleged improprieties had not been concealed from public knowledge. Finally, McIntire's memo pre-empted the agency's opportunity to respond to the auditor's report. This was clearly contrary to the agency's interests, and consistent only with McIntire's personal stake in the matter.[3]

Having identified the interests of the individual and the state, the *Pickering* test requires us to balance McIntire's interest, as a citizen, speaking out on a matter of public concern, against the interest of the agency, as employer, in furthering the agency's work. *See Rankin,* 107 S.Ct. at 2898; *Connick,* 461 U.S. at 149–51, 103 S.Ct. at 1691–92.

■ Balancing these interests in the context of qualified immunity moves the fulcrum on which the decision turns. To penetrate the government officials' qualified immunity, the balance must be in favor of the employee to a degree that evidences a clearly established right. The unlawfulness of the act must be apparent in the light of pre-existing law. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Courts usually ascertain whether the claimed violated right has been clearly established by comparing the facts of the case under consideration with other decided case facts. *Johnson v. Morris,* 453 N.W.2d at 39. The Minnesota Supreme Court made this comparison in *Finch v. Wemlinger,* 361 N.W.2d 865, 870–71 (Minn.1985). The court weighed that balance in favor of the immunity of government officials who had discharged an employee for informing certain state senators that hiring practices in his agency were politically motivated. The court observed that the holding of *Pickering* did not create a standard that the officials would have known they violated in their treatment of Finch. *Id.*

Although McIntire was discharged eight years after the discharge in *Finch,* intervening case law has not established a clear standard which the officials in this case transgressed in terminating McIntire's employment. On these facts the individual respondents did not violate clearly established first amendment rights by discharging McIntire.

## II.

### Procedural Due Process

■ To be cognizable, McIntire's due process rights must be based on a protectible property interest in continued employment. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). McIntire was a probationary employee. Although probationary status does not insulate the agency from liability for free speech violations, absent such a violation McIntire must demonstrate an independent property interest in continued employment to survive dismissal on her due process action. There is no evidence in the record that any rules or understandings conferred to McIntire a right to continued employment. *See Id.*

---

**3.** Ordinarily, the question of whether there is office disruption or a need for loyalty and trust is a jury matter. *McGee v. South Pemiscot School District R–V,* 712 F.2d 339, 342 (8th Cir. 1983). Here, however, the facts peculiar to this case are sufficiently uncontroverted so that jury findings are unnecessary in the context of an immunity determination. *See McIntire I.* The objective qualified immunity standard adopted in *Harlow* militates in favor of resolving immunity issues without trial if possible. *See Harlow,* 457 U.S. at 816–817, 102 S.Ct. at 2737, *Johnson v. Morris,* 453 N.W.2d 31, 40 (Minn.1990).

McIntire has likewise failed to show a deprivation of any liberty interest. In *Roth,* the Supreme Court ruled that the dismissal of a government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community" triggers the due process right to a hearing at which the employee can publicly clear his or her name." *Id.* at 573, 92 S.Ct. at 2707. The Supreme Court later amplified its ruling, holding that if the charges are not made public, they cannot form the basis for a claim that the employee's good name or reputation was impaired. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).

McIntire was discharged for "willful misconduct." The agency did not inform prospective employers or the community at large of the reason for McIntire's dismissal. McIntire has not demonstrated that any employment opportunities have been foreclosed by the agency action. No liberty interest is implicated.

## III.

### *Discrimination*

McIntire alleges that she was discharged because of her race as an American Indian, contrary to 42 U.S.C. § 1981 and the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1(2) (1984).[4] In order to survive a summary judgment motion, McIntire must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Danz v. Jones,* 263 N.W.2d 395, 399 (Minn. 1978). A prima facie case may be established by direct evidence of discrimination or by a demonstration that:

(1) [the employee] is a member of a protected class; (2) [the employee] was qualified for the job from which he was discharged; (3) [the employee] was discharged, and (4) the employer assigned a

nonmember of the protected class to do the same work.

*Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 442 (Minn.1983).

McIntire did not submit any direct evidence of discrimination and her claims do not satisfy the four-part *Hubbard* test. The last element in the *Hubbard* test is clearly lacking as it is undisputed that McIntire was replaced by an American Indian. Because of her failure to establish a prima facie case, summary judgment on this cause of action was properly granted.

McIntire also claims that the conditions of her employment were discriminatory. Her bald charges of race discrimination in working conditions are inadequate as a matter of law to survive a summary judgment motion. These claims are also foreclosed because § 1981 prohibits discrimination only in the making and enforcement of contracts. It does not reach discriminatory working conditions. *Patterson v. McLean Credit Union,* — U.S. —, —, 109 S.Ct. 2363, 2373, 105 L.Ed.2d 132 (1989).

## IV.

### *Defamation*

When respondents fired McIntire, they informed the Department of Economic Security, the Human Rights Department, and a union representative that McIntire was terminated for "willful misconduct." Also, a statement explaining the reason for McIntire's discharge was placed in the agency's personnel file. McIntire claims that these communications defamed her character.[5]

Under Minnesota law, a party may be held liable for defamation when (1) a false statement (2) is communicated to a third person (3) which tends to harm the plaintiff's reputation or lower the plaintiff in the estimation of the community.

---

4. We assume, for purposes of this analysis, that a racially discriminatory discharge is actionable under Section 1981. *See Hicks v. Brown Group, Inc.,* 902 F.2d 630 (8th Cir.1990).

5. McIntire admits that she was not compelled to disclose respondents' statements to any prospective employer. See *Lewis v. Equitable Life Assurance Society of the United States,* 389 N.W.2d 876, 888 (Minn.1986).

*Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980). Respondents do not dispute, for the purposes of this appeal, the last two elements. They contend, however, that McIntire's actions were willful misconduct and, in any event, an absolute and qualified privilege shields them from liability.

In Minnesota, truth as a defense goes to the underlying implication of the statement, not to the statement's verbal accuracy. *Lewis,* 389 N.W.2d at 889. It cannot be disputed that McIntire knew she was disobeying her employer's orders. Whether this was willful misconduct in the larger sense may be a question of fact.

Even if McIntire could prevail on this element, liability does not attach if the statement is privileged. We have previously ruled that under state law public bodies and public officials have an absolute privilege to follow the requirements of the law. *Freier v. Independent School District No. 197,* 356 N.W.2d 724, 729 (Minn.App.1984) (quoting Restatement (2d) of Torts, Section 592A (1977)); *see Grossman v. School Board of I.S.D. No. 640,* 389 N.W.2d 532, 536 (Minn.App.1986). Respondents were required by law to disclose the reasons for McIntire's discharge to the Department of Employee Relations, the Department of Economic Security, and the Human Rights Department. *See* Minn.Stat. §§ 43A.33, subd. 3; 268.10, subd. 1; and 363.06, subd. 1. With respect to these publications, the respondents enjoy an absolute privilege and are immune to suit.

Whether respondents were permitted to place a statement explaining the reasons for McIntire's discharge in the agency's personnel file entails a qualified privilege. *Frankson v. Design Space International,* 394 N.W.2d 140, 144 (Minn.1986). When there is a qualified privilege, there can be no recovery for defamation absent evidence of actual malice. *Lewis,* 389 N.W.2d at 889.

McIntire has failed to demonstrate actual malice. There is no extrinsic evidence indicating ill will between the parties, nor is there intrinsic evidence, such as exaggerated language, which might suggest an in-

tent to injure McIntire. *See Frankson,* 394 N.W.2d at 144. The trial court correctly ordered summary judgment on McIntire's defamation claims on the ground of qualified privilege.

## V.

### *Breach of Contract*

■ McIntire asserts the violation of several rights under her collective bargaining agreement, including the right to (i) an appropriate job description, (ii) periodic job performance evaluations, and (iii) union representation during questioning. We find no merit in McIntire's position. Nothing in the record indicates that McIntire's bargaining agreement contemplated avenues of relief outside the grievance process. The grievance process provided McIntire with the right to have the union meet with the agency in an attempt to resolve her grievance. Within 10 days, the agency was required to decide whether her grievance was meritorious. No further process was provided, and it is evident from the procedural scheme set forth in the agreement that the agency decision was intended to be the exclusive procedure for consideration of the grievance. *See Bowen v. United States Postal Service,* 459 U.S. 212, 225 n. 14, 103 S.Ct. 588, 596 n. 14, 74 L.Ed.2d 402 (1983); *Vaca v. Sipes,* 386 U.S. 171, 184 n. 9, 87 S.Ct. 903, 913 n. 9, 17 L.Ed.2d 842 (1967); *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 657–658, 85 S.Ct. 614, 618–619, 13 L.Ed.2d 580 (1965).

## VI.

### *Wrongful Discharge*

■ Finally, McIntire argues that she was discharged in violation of the public policy exception to at-will employment. In *Phipps v. Clark Oil and Refining Corp.,* 396 N.W.2d 588 (Minn.App.1987), *aff'd.,* 408 N.W.2d 569 (Minn.1987), an at-will employee refused to dispense leaded gasoline into an automobile equipped to receive only unleaded gasoline, correctly believing that such an act would be in violation of the law. After being terminated for this conduct, the employee brought suit for wrong-

ful discharge. On appeal, this court ruled that an employer may not discharge an employee for reasons that "contravene a clear mandate of public policy." *Id.* at 592.

Applying *Phipps*, we do not believe the reasons for McIntire's discharge contravened a clear mandate of public policy. Unlike *Phipps*, McIntire was not asked to violate the law. Moreover, McIntire's discharge did not violate any clearly established statutory or constitutional rights. The "whistleblower" statute, Minn.Stat. § 181.932, had not yet been enacted. Accordingly, the trial court correctly dismissed this claim.

### DECISION

The trial court properly granted summary judgment on McIntire's claims relating to free speech, procedural due process, discrimination, defamation, breach of conduct and wrongful discharge.

Affirmed.